# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brett W. Huber, Sr. and Renae Berkland Huber, as Co-Trustees for the next-of-kin of Brett Warner Huber, Jr., | Case No. _____ |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| Cristina Ann Marie Sobiech, acting in her individual capacity as a Todd County correctional officer; James Olson, acting in his individual capacity as a Todd County correctional officer; John Does 1-2, acting in their individual capacities as Todd County correctional officers; Scott Wright, acting in his individual and official capacities as Jail Administrator of the Todd County Jail; and Todd County, | |
| Defendants. | |

For their Complaint, Brett W. Huber, Sr. and Renae Berkland Huber, as co-trustees for the next-of-kin of Brett Warner Huber, Jr., state and allege as follows:

1.      This is an action for money damages for the death of Brett Warner Huber, Jr. ("Brett") on June 11, 2017, as a result of the deliberate indifference of Todd County and the individual Defendants at the Todd County Jail (the "Jail") from March 18, 2017, to June 9, 2017.  The money damages sought are those attributable to the deprivation of Brett's civil rights under federal common law and not the state wrongful death measure of damages.


EXHIBIT
3

2.      The deliberate indifference of Todd County and the individual Defendants proximately caused Brett's death, thereby violating his well-settled federal civil rights while acting under the color of state law.

3.      By Order dated January 3, 2018, signed by Todd County District Court Judge Douglas P. Anderson, Brett W. Huber, Sr. and Renae Berkland Huber ("Plaintiffs") were appointed co-trustees for Brett's next-of-kin. Plaintiffs are Brett's natural parents. A copy of the Order is attached hereto as Exhibit A.

4.      Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3). The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this action. State-law claims and, by consequence, the limitations and defenses under state law are not applicable to this civil-rights lawsuit.

5.      Brett was at all times material herein a citizen of the United States and a resident of Anchorage, Alaska. He was born on January 12, 1992, making him 25 years old at the time of his death.

6.      Defendant Todd County is a "public corporation" suable under Minnesota Statutes § 373.01, subd. (1)(a)(1). Todd County is, and at all times relevant was, a political entity charged with control and supervision of all personnel of the Todd County Jail.

7.      Upon information and belief, Defendant Cristina Ann Marie Sobiech ("Sobiech") was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer at the Todd County Jail.

2

8.      Upon information and belief, Defendant James Olson ("Olson") was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer at the Todd County Jail.

9.      Upon information and belief, Defendants John Does 1-2 were at all times material herein citizens of the United States, residents of the State of Minnesota, and acting under color of state law as correctional officers at the Todd County Jail.

10.     Upon information and belief, Defendant Scott Wright ("Wright") was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as Jail Administrator of the Todd County Jail.

## BRETT'S BACKGROUND AND STRUGGLES WITH ADDICTION

11.     Brett grew up in Spearfish, South Dakota, and graduated from Spearfish High School in 2010.  He then moved to Hawaii to assist with his father's business.

12.     Eventually, Brett returned to South Dakota to attend Black Hills State University, but he left in late 2013 to move to Alaska, later obtaining positions as an aide to a member of the Alaska House of Representatives and a page in the Alaska Senate.  He served in those roles for several legislative sessions.  Here, he can be seen (on the left) using a glockenspiel to ring the Alaska Senate into session on February 24, 2014:

3



13.     In 2016, Brett was able to parlay his legislative experience into a position working as a staff aide for Alaska's junior United States Senator, Dan Sullivan.  He moved to Washington, D.C., for this job.

14.     Despite his successes, however, Brett suffered from mental illness, including anxiety and depression.

15.     Moreover, Brett had continual struggles with drug addiction.

16.     In early 2017, Brett entered rehab for drug treatment.

17.     He returned to Washington after successfully completing treatment, but eventually he left his position with Senator Sullivan and traveled to Minnesota, where he was staying with his girlfriend when things unraveled.

4

## THE EVENTS CULMINATING IN BRETT'S ARREST

18.     At approximately 1:57 p.m. on March 18, 2017, the Todd County Sheriff's Office received a 911 call that a white 2007 Kia Sedona minivan had been stolen out of a driveway in Osakis, Minnesota.

19.     Minnesota State Patrol Sergeant Scott Ras heard a radio report about the stolen Kia while patrolling westbound on Interstate 94, near mile marker 117 in Todd County.

20.     Moments later, Ras observed a white van driving southbound through the highway's westbound ditch, which then entered the westbound lanes of the highway proceeding in the wrong direction (eastbound).  The van was driving directly at Ras.

21.     Ras activated his emergency lights, but the van quickly veered into the median and crashed into the median cable barrier.

22.     The van's lone male occupant was Brett, who was suffering the effects of his drug use.

23.     Brett jumped out of the van and approached Ras's patrol-car door, pounding on the window while screaming that someone was going to kill him.

24.     Ras reported that Brett was "hysterical."  He looked to Ras as though he was thinking about taking Ras's car.

25.     Ras would later learn that Brett had gone to the Douglas County Hospital in Alexandria, Minnesota, that morning seeking help for an overdose of ecstasy but had left shortly thereafter.  He then stole a car and drove to Osakis before crashing the car and stealing the Kia from a nearby residence.

5

26.     Ras attempted to calm Brett down and make sense of what he was saying, but he was flailing his arms and pushed the officer.

27.     Ras then grabbed Brett's arm and took him to the ground to handcuff him, but Brett slipped away, jumped over the cable barrier, and began running in the eastbound lanes of traffic.

28.     While in the eastbound lanes, Brett waved his arms and attempted to get passing motorists to stop. When they did so, Brett attempted to open their doors, but he was unsuccessful.[1]

29.     Eventually, Brett ran to a tractor-trailer that had stopped in traffic and climbed atop the trailer's roof.

30.     There, he yelled, howled, and waved his arms at passing traffic.

31.     Other officers soon arrived on the scene and attempted to entice Brett to climb down. He refused.

32.     Brett constantly paced atop the trailer, waving his arms. At one point he urinated, and several times he asked for water. He also removed his shirt.

33.     It was apparent to Ras and the other officers that Brett was "under the influence of some type of controlled substance" and Ras claimed that Brett appeared to be suffering from "excited delirium."

---

[1] A motorist recorded much of Brett's actions on the highway after he crashed the van, with the video widely reported in local media. *See, e.g.,* Heidi Wigdahl, Suspect stops traffic on I-94, climbs on semi, available at https://www.kare11.com/article/news/suspect-stops-traffic-on-i-94-climbs-on-semi/424052513; Beth Leipholtz, Mayhem on I-94: Car theft suspect climbs on truck in Alexandria, Minn., available at http://www.woodburybulletin.com/news/4237972-mayhem-i-94-car-theft-suspect-climbs-truck-alexandria-minn.

34.     The officers eventually decided to bring in a fire department ladder truck to remove Brett from the tractor-trailer.

35.     When the ladder truck arrived, Brett jumped onto it and paced around.

36.     He then jumped back onto the tractor-trailer, ran across the top to the cab, and then climbed down, where officers finally handcuffed him.

37.     Reportedly due to his "bizarre irrational behavior," Brett was transported to CentraCare Hospital in Sauk Centre, Minnesota.

38.     At the hospital, Brett continued acting "irrationally" and expressed concerns that law-enforcement was going to "chop him up."

39.     Todd County Sheriff's Deputy Lonnie Marcyes arrived at the hospital at approximately 4:22 pm and advised Brett that he was under arrest for burglary and auto theft.

40.     Due to Brett's impairment, Marcyes found it impossible to carry on a conversation with him.

41.     Nevertheless, only one hour later, Brett was booked at the Todd County Jail.

42.     Defendant correctional officer James Olson completed a brief medical-history form for Brett at booking.

43.     The form includes a number of questions, including "suicidal history" and "recent hospitalizations/treatments."

44.     The form is marked "no" for suicidal history and "yes" for recent hospitalizations/treatments, followed by the note, "was checked out before [being] brought to jail."

7

45.     Olson also completed a "Brief Jail Mental Health Screen" for Brett at 6:17 pm on March 18, 2017.

46.     That form contained eight questions with the following instructions: "This detainee should be referred for further mental health evaluation if he/she answered: YES to item 7; or YES to item 8; or YES to at least 2 of items 1 through 6; or if you feel it is necessary for any other reason."

47.     According to the form completed by Olson, Brett answered each question in the negative except question six, which asked, "Have there currently been a few weeks when you felt like you were useless or sinful?"

48.     The box "No" is checked in the "Referral" section, indicating that Brett was not referred for a mental-health evaluation – despite his earlier "bizarre irrational behavior" and hospitalization immediately preceding his arrest.

49.     The Jail initially housed Brett in Holding Cell 10.  Nevertheless, he was not restricted from being moved to the Jail's general population, nor, upon information and belief, was he placed on Close Observation status.

50.     Based on the records provided to Plaintiffs by Todd County, Brett did not receive a proper health screening upon his arrival to the Jail, in violation of Minnesota Department of Corrections Policy 500.306.

51.     Based on the records provided to Plaintiffs by Todd County, Brett did not receive a proper mental-health screening within 14 days of his arrival to the Jail, in violation of Minnesota Department of Corrections Policy 500.306.

## BRETT'S BIZARRE BEHAVIOR IN THE TODD COUNTY JAIL
## LAYS BARE HIS SERIOUS MENTAL-HEALTH ISSUES

### *The March 20 incident*

52.     On March 20, 2017, Brett was still being housed in Holding Cell 10 when he requested ibuprofen.

53.     Three correctional officers – Defendant Cristina Ann Marie Sobiech, Andrew Mattson, and Connie Spanswick – went to Brett's cell to pass him the medicine.

54.     After receiving the medicine, Brett sat down in the hallway outside and refused to go back in his cell, instead peppering the officers with questions ranging from lip balm to upcoming court appearances.

55.     The officers told him to return to his cell, but he did not respond to their commands.

56.     Ultimately, Sobiech and Mattson had to lift Brett by his arms and carry him back into his cell, where he again sat on the floor.

57.     This was but the first of several incidents in which Brett exhibited obvious symptoms of serious mental-health issues that went ignored by Defendants.

58.     Indeed, Brett was suffering from serious mental-health problems the entire time he was at the Jail, yet he was never properly screened for those problems or suicidal ideation, let alone treated for them.

### *The March 21 incident*

59.     The following day, at approximately 3:54 pm, Defendant Sobiech was in the hallway outside of Holding Cell 10 when Brett knocked on the cell door.

9

60.     Sobiech asked Brett what he needed but she could not understand his response, so she opened the cell door and again asked what he wanted.

61.     Brett then asked Sobiech about calling someone to get his chemical-dependency evaluation completed, which had been ordered by the Todd County District Court one day earlier.

62.     Sobiech told Brett she had been busy and "it would get done," and she then asked him about contacting his lawyer.

63.     Brett responded, "If I'm not going to get out of here, why don't you guys just let me do it right now?"  When Sobiech asked Brett, "Do what?", he replied, "Why don't you guys just let me kill myself right now?"

64.     Brett then told Sobiech that he didn't want to kill himself but wanted to go home.  He exited his cell repeating that he wanted to go home.

65.     Sobiech ordered Brett back inside, but he did not comply.

66.     Sobiech grabbed the front of Brett's sweatshirt while he repeated that he wanted to go home.

67.     Brett then pulled away and took off running through the Jail, as Sobiech radioed for help.

68.     Sobiech chased after Brett, who eventually circled back towards her.  She aimed her Taser at him and ordered him to stop multiple times, but he failed to comply.

69.     Sobiech then fired her Taser, striking Brett in the abdomen and causing him to fall to the floor.

70.    A Todd County Sheriff's Deputy arrived seconds later and assisted handcuffing Brett.

71.    Brett was then brought back to Holding Cell 10 and told that he would remain in handcuffs until he calmed down.

72.    More than twenty minutes later, Sobiech and three Todd County deputies entered Holding Cell 10, removed Brett's handcuffs, and "assisted him in putting on the suicide gown."

73.    Sobiech also notified Defendant Scott Wright, the Jail Administrator, of the incident.

74.    Despite Brett's erratic behavior, despite expressing a desire to commit suicide, and despite having to be Tasered, handcuffed, and placed in a "suicide gown," there is no indication in Brett's Jail records that he saw any medical professional on March 21.

75.    Instead, Brett was moved into the Jail's general population three days later, on March 24, 2017, apparently without seeing any medical or mental-health professional.

76.    Comments on Brett's Cell Transfer Log indicate that he was moved to the "A" cells, in general population, "with nurse approval," but the documents provided to Plaintiffs by Todd County contain no nursing notes documenting that approval.

### *The April 27 incident*

77.    Meanwhile, Brett's mental health continued to worsen.

78.    On April 27, 2017, at approximately 8:56 am, correctional officer Charles Kloos was performing cell checks in the "A" cells when he radioed Defendant Wright that he needed to come speak with an inmate.

79.    In response to the radio call, Defendants Wright and Sobiech went to the hallway by the A cells.

80.    Once there, they found Brett in the hallway requesting to call President Trump.

81.    Brett stated that a lot of people would get hurt if the Jail did not let him use the phone.

82.    The officers explained that Brett could use the phone in the Jail's booking area, but at that point he "started having mental health issues" and refused to walk to booking, stating that someone was around the corner who was going to shoot him.

83.    The officers then asked Brett if he wanted to speak an individual who was at the Jail to run the "Men's group." Brett agreed, but then changed his mind.

84.    Around that time, Todd County Sheriff Don Asmus entered the hallway.

85.    Brett asked who he was and Sobiech told him it was the Sheriff.

86.    Brett then asked Asmus for a cell phone to make some phone calls, and the officers again told him that he could use the telephone in booking.

87.    Brett finally agreed to use the booking phone, as long as officers walked alongside him to the booking area to ensure that no one would shoot him.

88.    But as the officers began escorting Brett to booking, he took off running.

89.    Sobiech and Kloos eventually were able to catch up to Brett and grab ahold of him, pulling him toward the booking area.

90.    The officers opened the door to Holding Cell 11, intending to put Brett inside.

12

91.     Brett, however, wrapped his leg around the door and fought being placed inside the cell.

92.     The Sheriff, Kloos, and Sobiech all struggled to get Brett into the cell. The Sheriff described Brett as "out of control."

93.     Other officers and deputies soon arrived in the booking area, including Defendant Wright, who "helped pry [Brett's] hand from the cell door."

94.     Brett was then "locked down" in Holding Cell 11 "due to [his] behavior in the hallway."

95.     Once inside Holding Cell 11, Brett tried to tie a shirt around his neck and made suicidal comments.

96.     The officers decided to place him in a suicide gown or suicide "smock," but he was not complying with their directives.

97.     Eventually, Brett removed his clothes and was handed the suicide gown to put on.

98.     Todd County Sheriff's Deputy Joshua Nice, who had responded to the booking area, then heard the water turn on in the cell.

99.     Nice looked inside the cell and saw Brett plugging his nose and pouring water into his mouth.

100.    Brett coughed profusely and then got more water and repeated the process.

101.    It appeared to Nice that Brett was attempting to drown himself, so Sobiech turned off the water to the cell.

13

102.   At that point, Brett coughed profusely again but returned to normal breathing. He remained locked down in Holding Cell 11 for the remainder of the day, and in fact for the entire next week.

103.   As with the March 21 incident, however, there is no indication in Brett's Jail records that he saw any medical or mental-health professional on April 27, despite his obviously suicidal ideations.

104.   Indeed, despite having been at the Jail for more than five weeks at that juncture, there is no indication in the records received by Plaintiffs from Todd County that Brett had seen a doctor, nurse, or qualified mental-health professional.

105.   Instead, Brett's obvious symptoms of mental-health issues continued, untreated, in the following days and weeks.

106.   Brett's father observed this firsthand on April 30, 2017, when he visited Brett at the Jail.

107.   Upon seeing Brett on April 30, Brett's father asked "What's with the vest?", referring to the suicide gown. Brett responded, "Apparently I tried to kill myself."

108.   Brett was despondent and crying throughout the nearly 25-minute visit. He told his father that he thought people were out to get him and that he didn't think God forgave him for his actions.

109.   Brett also expressed that he had "missed his chance" and could no longer feel things.

110.   He additionally told his father that he used to be able to hear God but couldn't any longer, that he had "lost his sight" and his eyes did not work.

14

111.    Brett expressed fear that he was going to be sentenced to "pain camp" where he would be "tortured."

112.    Brett told his father that he thought he was going to die.

113.    Brett's father reminded him that he was family, that he was loved, and that people were praying for him, and he implored him not to give up.

114.    He also told Brett that he would speak to the "jailer" once their visit ended.

115.    Later that day, Brett's father spoke to the Jail Administrator, Defendant Wright, expressing concerns about Brett's mental and physical well-being.

116.    Neither Wright nor anyone else at the Jail made any effort to have Brett evaluated or treated for mental-health issues as a result.

117.    Instead, records indicate that a Jail nurse saw Brett *a full week later*, on May 4, 2017.

118.    On that date, the nurse reported that Brett was "again in a holding cell due to his behavior.  He was seeing things crawling in the hallways."

119.    The Jail nurse did not perform an adequate mental-health screening or otherwise properly assess Brett's suicidal tendencies or ideations.

120.    Instead, the nurse simply asked Brett whether he was feeling suicidal or homicidal, which he reportedly denied.

121.    Even had such a denial occurred, it is well-understood that such a denial could not be relied upon by medical or qualified mental-health providers.

122.    Nevertheless, following his reported denial, the Jail nurse requested that Brett be returned to the Jail's general population.

15

123.    On May 4, 2017, at approximately 2:22 pm, Brett was moved from Holding Cell 11 to cell E-37.

124.    Brett's mental-health continued to deteriorate after he was returned to general population.

125.    Indeed, on May 5, 2017, Brett again saw the Jail nurse, requesting an outside office visit for depression.

126.    He was transported to a CentraCare Health clinic in Long Prairie, Minnesota, where he was seen by nurse practitioner Tricia Shoutz.

127.    Shoutz's treatment notes document symptoms that were observable and obvious to Jail staff.

128.    The notes, for example, indicate that Brett was being seen for "thoughts in his head," and that he felt like "there is someone out to kill him."

129.    The notes also indicate that Brett had recently "had a psychological breakdown" and thought the end of the world was coming.

130.    Brett reported to Shoutz that he was "nervous about everything," was unsure if he had recently heard voices, and admitted to feelings of being better off dead.

131.    Brett also indicated that he was unsure how long he would be in jail and was feeling down, depressed, and hopeless nearly every day.

132.    Shoutz noted that Brett was calm and cooperative but presented with "flat affect," a severe reduction in emotional expressiveness symptomatic of persons with depression.

133.    Shoutz assessed Brett with the additional symptom of paranoia and diagnosed him with "severe episode of recurrent major depressive disorder, with psychotic features."

134.    Shoutz opined that it was unclear if Brett's paranoia was coming from significant depression, his history of drug use, or some underlying psychotic illness, and she noted he would "likely benefit from a full psychiatric evaluation."

135.    None was scheduled, and no such full psychiatric evaluation ever took place.

136.    Shoutz prescribed Brett an antipsychotic, Abilify, and asked that he return in four weeks if he remained in the Jail at that time.

137.    No return appointment ever took place.

138.    Instead, Brett inexplicably was returned to the Jail's general population, where his mental-health problems only continued to deepen.

### *The May 13 incident*

139.    On May 13, 2017, Brett asked to call his parents.  Correctional officer Jennifer Becker permitted him to do so from the booking area.

140.    Brett first called his mother, leaving her an "emotional" voicemail telling her that he loved her and was sorry for all the trouble he had caused.

141.    Becker then asked if Brett wanted to call his father.  He at first declined and then changed his mind, but as the call was ringing, Brett hung up.

142.    Brett then returned to his cell.

143.    Later that afternoon, Becker was doing cell checks when she spoke to Brett.

144.    She asked Brett if he was OK, and he responded that he didn't know if he was going to heaven because of all the trouble he had been in.

17

145.   When Becker asked Brett if he had even been in Jail before, he said "Kenya" and then stopped and said never mind.  Brett has never been to Kenya.

146.   Brett then told Becker than he didn't think he would make it to heaven and that he didn't feel right in his head.

147.   He also told Becker that he did not feel as if "this is reality anymore."

148.   Brett asked Becker if he was safe at the Jail and Becker told him that he was.

149.   Becker then contacted the Jail Administrator, Defendant Wright, to advise him of her conversation with Brett.

150.   Upon information and belief, Wright took no documented steps to act on the report from Becker.

### *The May 17 incident*

151.   On May 17, 2017, Brett's father visited him at the Jail.

152.   Brett expressed that he was "worried" and "scared."  He said that he was not really sleeping.

153.   Brett told his father that he thought as though he was hurting other people.

154.   He also expressed concerns that he could be given a life sentence and locked away "forever."

155.   Brett repeatedly asked his father if he was going to go to heaven.

156.   Brett was crying and despondent during the visit.  He asked his father to pray with him.

157.   That same day, Defendant Olson observed Becker speaking with Brett in "E" cell.

158.   Olson overheard Brett ask to speak with him.

159.   Brett asked Olson about his legal proceedings and then asked if he (Brett) was going to hell.

160.   Brett also told Olson that he was scared of a correctional officer who he felt had treated him improperly, but he declined to identify the officer.

161.   Olson later contacted the Jail Administrator, Defendant Wright, to advise him of his conversation with Brett.

162.   Wright took no steps to act on the report from Olson.

163.   On May 28, 2017, Brett's father again visited him at the Jail.

164.   He told Brett that it did not appear he was eating, and Brett replied, "I'm just depressed."

165.   His father implored Brett to take care of himself.

166.   Brett's father visited him again at the Jail on June 4, 2017.

167.   Brett was manifesting obvious symptoms of serious anxiety and depression by this time.

168.   Brett asked his father if he (Brett) was evil and expressed that he did not know what was going on anymore.

169.   He appeared obviously tired and at one point started repeating, "It's OK."

170.   He wondered aloud whether he would ever get to leave the Jail.

171.   Brett stated that his father's wristwatch worried him. When his father asked why, Brett responded, "Everything worries me."

172.   The visit ended with Brett crying and saying he just wanted to go home.

19

173.   His father told Brett that he was doing what he could to make that happen, but that it was going to take some time.

174.   Brett's father was gravely concerned for Brett's well-being following this visit and voiced his concerns to the Jail Administrator, Defendant Wright.

175.   Upon information and belief, Wright took no documented action in response to Brett's father's concerns.

176.   Jail records indicate that a Jail nurse saw Brett the next day, June 5, 2017, in order to obtain a refill of his Abilify prescription.

177.   Notes from that meeting indicate that the nurse spoke with Brett "and staff and all state[d] is going well. Ø concerns at present."

178.   The Jail nurse did not perform a mental-health screening or otherwise assess Brett's suicide risk.

179.   Nor did the nurse document anything about Brett's physical appearance, affect, or thought patterns.

180.   The nurse did not document any of the obvious symptoms so easily perceived by Brett's father.

181.   Instead, the June 5 nursing notes simply indicate that a refill of the prescription would be obtained and the nurse would schedule a recheck for the following week.

182.   Brett would hang himself four days later.

183.   On June 7, 2017, Brett's father visited him again at the Jail.

184.   His father instantly noticed that Brett appeared unkempt and looked as if he had not showered.

185.   Brett's father expressed concerns for Brett's well-being.

186.   Brett told his father that he could not trust anyone at the Jail and that he felt like he had "pissed off" everyone in his life.

187.   Brett's father said that he cannot just quit, and Brett responded, "I feel like quitting."

188.   Brett was despondent and crying through the visit.

189.   After completing his visit, Brett's father once again spoke to the Jail Administrator, Defendant Wright, expressing concerns about Brett.

190.   Wright took no documented action in response to Brett's father's concerns.

### *The June 8 incident*

191.   At approximately 6:00 pm on June 8, 2017, Brett was moved from general population cell A-75-Lower to a cell in "Ad Seg," or administrative segregation.

192.   The reason noted was, "moved due to inmate [Brett] scared in A block."

193.   Upon information and belief, supervisory approval for this move was not obtained, in violation of rules promulgated by the Minnesota Department of Corrections. "Administrative Segregation," Minn. Dept. of Corr. Div. Directive 301.085.

194.   Brett was housed by himself in one of two cells in Ad Seg, the other empty.

195.   Around 10:35 pm that evening, Brett requested to speak with Defendant Olson as he was performing cell checks.

21

196.   Olson told Brett that he would return to speak with him once his rounds were completed.

197.   When Olson did so, Brett immediately asked if he was a good person.  Olson told him that he believed Brett was.

198.   Brett expressed concerns to Olson with how long his court proceedings were taking.

199.   Olson told Brett that he would not be at the Jail forever and there was a light at the end of the tunnel.

200.   Olson then asked Brett how he was doing, and he responded, "terrible."

201.   Brett told Olson that he just wanted to go home.

202.   About four hours later, at 2:52 am on June 9, 2017, Olson was performing cell checks when Brett asked him what the noises were he was hearing from upstairs.

203.   Olson responded that there should not be anyone upstairs at that time of the night, and he asked Brett what kind of noises he was hearing.

204.   Brett responded that it sounded like people were screaming upstairs.

205.   Olson heard no abnormal sounds.

206.   Olson told Brett to try to get some sleep, since he had not slept at all that night.

207.   Despite Brett's obvious delusion, Olson did nothing to obtain medical treatment for him or have him closely supervised or monitored in Ad Seg.

## BRETT'S SUICIDE

208.   Defendant Sobiech started her shift at the Jail at 8:00 am on June 9, 2017.

22

209.   When she arrived at work, Sobiech was informed that Brett wanted to speak to her.

210.   The two then had a short conversation about Brett's court-ordered mental-health evaluation.

211.   Brett expressed concern to Sobiech that he was going to be hurt at the evaluation.

212.   Sobiech noted that Brett "seemed different" in this conversation.

213.   Nevertheless, Sobiech did not report any concerns to the Jail's medical staff and continued to leave Brett housed alone in Ad Seg.

214.   A video surveillance camera ("Camera 1") monitored the common area outside the two cells in Ad Seg, which had a 24-hour clock element on its recorded video.

215.   Another video surveillance camera ("Camera 2") monitored the inside of Brett's cell in Ad Seg, and it too had a 24-hour clock element on its recorded video.

216.   A third video surveillance camera ("Camera 28") monitored the hallway outside Ad Seg.  It also had a 24-hour clock element on its recorded video.

217.   The purpose of these cameras is for correctional officers to continually monitor inmates in Ad Seg.

218.   Yet, by their own admissions, the Jail's correctional officers monitored the cameras only infrequently, as they reported they were "too busy" with other tasks.

219.   The 24-hour times specified in the subsequent paragraphs are those noted on the surveillance videos provided to Plaintiffs by Todd County, recorded by Cameras 1, 2, and 28.

23

220.  At 12:56:14 on the video of the Ad Seg common area, a correctional officer opens the Ad Seg door and calls out to Brett.  The officer enters the common area, and Brett exits his cell.

221.  Brett can then be seen exiting Ad Seg with the officer.

222.  The Jail's "activity log" indicates that at approximately 1:02 pm, Brett was in the "Rec Room" for "recreation/library," but he returned to his cell shortly thereafter.

223.  The video of the Ad Seg common area shows Brett reentering Ad Seg at 13:07:49.

224.  Brett can then be seen slowly walking into his cell before walking back into the common area, where he turns on the television and appears to flip through channels.

225.  Brett proceeded to watch television for approximately 3-1/2 minutes before turning off the television and walking back into his cell.

226.  The video recorded from Brett's cell shows him entering his cell at 13:13:52.

227.  Brett proceeded to remove his shoes and lay down in his bunk.

228.  At 13:18:29, Brett can be seen sitting up on his bunk.

229.  He sat cross-legged on his bunk until 13:21:55, at which point he laid back down.

230.  At 13:26:31, Brett got up from his bed.

231.  He then reached for linens on the floor of his cell.

232.  At 13:26:40, Brett wrapped a sheet around the corner of the top bunk.

233.  Three seconds later, Brett began twirling the sheet in his hand:

24



234.    Brett continued to twirl the sheet for nearly a full minute, until placing it over the corner of the top bunk at 13:27:31.

235.    Brett then spent until 13:28:15 working the sheet at the corner, at which point he sat down on the lower bunk and wrapped the sheet around the back of his neck:



236.    At 13:28:17, Brett wrapped the sheet around the rest of his neck and tied it in place, fashioning a noose.

237.    The end of the sheet wrapped around the corner of the top bunk then fell off. Brett reattached it and lowered himself to the floor at 13:28:49, with the noose tied tightly around his neck:



238.   Over the ensuing minutes, Brett's legs can be seen twitching.

239.   Several times he reached his hands up to the noose, but then brought them back down.

240.   At 13:30:30 on the cell video, Brett can be seen struggling.  He appeared to be gasping for air.

241.   At approximately 13:31:07 on the video, Brett's body appears to tense up and he slowly turns onto his right side.

242.   The cell video then stops recording at 13:31:13, before resuming again more than seven minutes later, at 13:38:42.

243.   Incredibly, the Jail's log of inmate activities *claims a cell check on Brett was performed at 1:31 pm on June 9, 2017.*

244.   This so-called "cell check" was a complete fabrication.

245.   No correctional officer checked Brett's cell at 1:31 pm on June 9, 2017.

246.   Had a correctional officer done so, he or she would have easily seen Brett hanging from the noose in his cell.

247. Instead, when the video from Brett's cell resumes at 13:38:42, he can be seen laying limp and motionless on the floor.

248. The video from the Ad Seg common area recorded Sobiech calling out "Mr. Huber?" and "Huber?" from the Ad Seg door at 13:38:28.

249. Sobiech thought to call Brett not to perform a cell check, but rather because a representative of Teen Challenge arrived at the jail for a program.

250. When Sobiech received no response, she called down the hallway to correctional officer Mark Turner, to see if he had already retrieved Brett to meet with the representative.

251. Turner answered in the negative. Sobiech's first thought at that point was, "oh boy."

252. Only then did Sobiech actually enter Ad Seg, peering into Brett's cell at 13:38:40.

253. She then saw Brett's motionless body and yelled out "Huber!"

254. Sobiech exited Ad Seg and called down the hallway for help from Turner and correctional officer James Switters.

255. She then exclaimed, "shit!"

256. Switters and Sobiech entered Brett's cell, where Switters removed the noose from around Brett's neck.

257. Sobiech then radioed for an ambulance.

258. Brett was not moving and was not breathing.

259. Turner, who had entered Brett's cell, began to perform CPR.

27

260.   Paramedics arrived at Brett's cell at approximately 13:42:45.

261.   The paramedics began manually ventilating Brett and connected a "Lucas device," a chest-compression machine that performs automated CPR.

262.   The paramedics transported Brett by ambulance to the emergency room at CentraCare Health – Long Prairie, leaving the Jail at 1:49 pm.

263.   Brett had no pulse in the ambulance and an automated external defibrillator recommended "no shock."

264.   When Brett arrived at the emergency room at 1:52 pm, he was in cardiac arrest and asystole, with no heart rhythm.  He was not breathing on his own, his pupils were fixed and dilated, and he had no pulse.

265.   Medical personnel injected Brett with 1 milligram of epinephrine, after which they found him to be in v fib.

266.   He was then defibrillated or "shocked" with 200 Joules and administered 300 milligrams of amiodarone.

267.   Following this, Brett was in sinus tachycardia.

268.   Medical personnel inserted a breathing tube and contacted Life Link to transport Brett to another facility.

269.   A Life Link helicopter arrived at 2:43 pm and flew Brett to St. Cloud Hospital.

270.   The first time Todd County finally assigned someone to monitor Brett 24 hours a day was when he was on life support at the hospital.

271.   But despite the efforts of medical personnel, Brett would never recover.  He died two days later, on June 11, 2017.

272.    Dr. Michael McGee, the Ramsey County Medical Examiner, noted that the immediate cause of Brett's death was "anoxic brain injuries" and the manner of death was suicide.

## THE MINNESOTA DEPARTMENT OF CORRECTIONS' INVESTIGATION

273.    The Minnesota Department of Corrections ("DOC") investigated Brett's suicide at the Jail and issued a letter to Todd County Sheriff Don Asmus detailing its findings on August 22, 2017.  The letter is attached hereto as Exhibit B.

274.    The DOC concluded "there were two violations of the Chapter 2911 rules" – that is, Minnesota Administrative Rules pertaining to correctional facilities – in regards to Brett's death.

275.    In particular, the DOC's letter noted that multiple cell checks were logged that did not actually occur, *including the reported cell check at 1:31 pm on June 9, 2017.*

276.    The letter also noted that the Jail had failed to perform well-being checks on June 9 every 30 minutes, in violation of Minnesota Administrative Rules Part 2911.5000, subpart 5.

277.    The DOC further noted that timely completion of well-being checks and accurate log recording were "the same compliance issues [noted] for [an] earlier in-custody death on May 7, 2017."

278.    Upon information and belief, neither Todd County nor Jail Administrator Wright took adequate steps to address the Jail's failure to timely conduct well-being checks or accurately report those checks following the May 7, 2017, in-custody death at the Jail.

279.    Notably, the Jail has a lengthy history of failing to comply with state Administrative Rules regarding correctional facilities.  Those compliance failures have been well-documented by the DOC.

280.    The most recent DOC Facility Inspection Report (the "Report") for the Jail is dated July 25, 2017.  It is attached hereto as Exhibit C.

281.    The Report concluded that the Jail was not in compliance with seven different "mandatory" Administrative Rules, and there were compliance "concerns" with five others.

282.    The Report also concluded that the Jail was not in compliance with eight different "essential" Administrative Rules, and there were "concerns" with five others.

283.    For example, the Report pointed out that the Jail has been chronically understaffed and required more full-time staff members.

284.    It also noted there was "little clerical support for the jail" and that the one hot meal provided to inmates each day came from a local restaurant.  "The breakfast and dinner meals are prepared by custody staff and inmate workers," even though custody staff may not undertake food-preparation responsibilities.  Minn. R. Part 2911.0900, subp. 25.

285.    The Report also pointed out that the Jail had not retained adequate maintenance staff, leaving routine maintenance tasks, such as changing light bulbs, to correctional officers.  "[T]his is not an appropriate use of custody staff time" and "detract[ed] from their primary responsibilities for ongoing supervision of inmates."

286.    In addition, the Report noted that the Jail's policy and procedure manual – which is required to contain, among other things, "a written suicide prevention and intervention plan," Minn. R. Part 2911.1900 – needed revisions.

287.    Indeed, one of the DOC's conclusions was that because of understaffing, Jail

Administrator Wright was required to undertake "other duties outside of his primary role,"

which prevented him from completing administrative tasks, "most notably revisions to the

policy and procedure manual."

288.    State rules also require that custody staff members receive a minimum of 16

hours of training each year on topics including, among others, "signs of suicide risk and

suicide precautions." Minn. R. Part 2911.1300.

289.    Most staff members at the Jail, however, "were well under the required

number of minimum annual training hours."

290.    Critically, the Report also noted serious deficiencies with well-being checks

and the logging thereof.

291.    The Report stated, "A review of the jail logs and video footage showed several

well-being checks over 30 minutes.  Others were being logged but not completed."

292.    The Report also found that correctional officers often were not fully entering

inmate cells when conducting well-being checks.

293.    According to the Report, these same issues were present during the Jail's 2016

inspection and a "plan was supposed to be developed" to address them.

294.    Upon information and belief, no such plan was ever developed or

implemented, and the issues persisted until the Jail was inspected again on July 25, 2017 – far

too late for Brett, who had died six weeks earlier.

295.    In a section labeled "Inspection Comments," the Report concluded that

"several rule compliance issues from last year's on-site inspection have not been addressed

31

or rectified.  Some of these issues were noted over several inspections including one [a] year

ago.  Some of these compliance issues have either not been addressed or have become worse

over the last year."

> 296.    With regard to well-being checks in particular, the Report stated:

> There continues to be concerns in regard to well-being checks.  A review of
> video footage and jail logs showed late rounds well in excess of 30 minutes.
> Additionally, some checks that were found to be documented on the jail log
> were found to have not been completed when compared to the review of
> video footage.  This is an unacceptable and potentially dangerous practice that
> opens up the Sheriff's Office to increased liability.  This practice clearly
> violates the Chapter 2911 rules.  Correctional deputies need to prioritize their
> duties so that well-being checks are completed according to policy and DOC
> standards.  The camera review also showed that staff are not always fully
> entering the housing units to complete well-being checks.  It is important for
> staff to enter the units, not only to ensure the physical well-being of inmates,
> but also the psychological well-being of the inmates.

> 297.    The Report makes clear, therefore, that Todd County and Jail Administrator

Wright were fully aware of the risks created by their lax oversight of inmates and the

documentation of well-being checks that were not occurring.

> 298.    Nevertheless, they made the conscious decision to endanger the well-being of

inmates in their custody and control instead of addressing known systemic problems at the

Jail.

> 299.    Todd County and Jail Administrator Wright deliberately chose a course of

conduct by which it was only a matter of time before an inmate committed suicide in their

custody.

> 300.    Their continued failure to follow the law is evidence of clear deliberate

indifference to the medical needs of inmates.

> 301.    These very same failures were a proximate cause of Brett's death.

## THE JAIL'S DELIBERATE INDIFFERENCE TO BRETT'S MEDICAL NEEDS

302.   Throughout Brett's confinement at the Jail, he repeatedly displayed and reported obvious symptoms of a serious mental-health illness and crisis.

303.   Brett admitted to suicidal ideations, and he acted on those ideations at least once before hanging himself on June 9, 2017.

304.   Brett admitted to experiencing serious anxiety and depression.

305.   Brett admitted to having hallucinations and delusions, including seeing things crawling in the hallways and hearing screaming from floors above him in the Jail.

306.   Correctional officers observed and were well aware that Brett was suffering from serious mental-health symptoms.

307.   For example, Sobiech informed a Douglas County Sheriff's Deputy investigating Brett's death that Brett "always seemed different," from the moment he arrived at the Jail.

308.   Similarly, correctional officer Turner informed the investigating Deputy that Brett was "agitated since he came into the jail."

309.   Brett's father, too, repeatedly expressed concerns for Brett's well-being to Jail staff, including Jail Administrator Wright, who failed to order an assessment or treatment for Brett's serious mental-health issues.

310.   Defendants deliberately ignored all of the warnings provided to them throughout Brett's stay at the Jail, including his suicidal gestures (including attempted use of a ligature and drowning) and ideations, his hallucinations and delusions, his assessments of

33

paranoia and diagnosed significant depression by Shoutz, and his increasing anxiety and depression.

311. These warnings mandated an immediate and complete psychiatric evaluation, but no such evaluation occurred before Brett hung himself on June 9, 2017.

312. Defendants also failed to ensure that Brett, who was suffering from a mental-health crisis, did not have the means and opportunity to commit suicide during his incarceration at the Jail on June 9, 2017.

313. Additionally, from the review of the video footage and the DOC's findings, it is clear that one of the correctional officers working on June 9, 2017, acted with deliberate indifference to Brett's constitutional rights by failing to determine the "well-being" that forms the essence and purpose of such checks and then falsely logged that such a check had occurred, while Brett was lying motionless on the floor of his cell with a sheet wrapped around his neck.

314. It is equally clear from the review of the video footage that one of the correctional officers working on June 9, 2017, acted with deliberate indifference to Brett's constitutional rights either by observing and ignoring Brett's behavior on the video feed from the Ad Seg cameras, which obviously indicated not only a serious and obvious risk of suicide but also a clear breach of correctional security and protocol, or else by consciously choosing not to monitor the video feed despite Brett's serious risk of self-harm.

315. Brett incurred special damages prior to his death, including but not limited to ambulance and EMS charges, medical bills from CentraCare Health and personnel associated

34

therewith, medical air transport charges, and medical bills from St. Cloud Hospital and its physicians and staff.

316.   Brett suffered a loss of economic opportunity.

317.   Brett endured pain and suffering from the time his serious and obvious medical conditions were ignored until the time of his death.

318.   Brett suffered a loss of future enjoyment of his life.

319.   Plaintiffs are entitled to recover these damages for Brett.

## COUNT ONE

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiffs v. Jail Administrator Scott Wright in his individual capacity*

320.   Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

321.   Obvious symptomatic manifestation of major depression with psychotic features, including suicidal ideation and action, are serious medical needs.

322.   Defendant Jail Administrator Scott Wright had a duty to provide for the safety and general well-being of Brett, including protecting him from himself, as an inmate at the Todd County Jail.

323.   Defendant Wright, under the color of state law, acted with deliberate indifference to Brett's life-threatening medical needs and his serious risk of suicide during his confinement at the Todd County Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

35

324.    Defendant Wright, under the color of state law, knew of and disregarded an obvious and serious risk to Brett's health and safety and acted with deliberate indifference, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

325.    Upon information and belief, Defendant Wright was notified in 2016, if not earlier, about serious and ongoing critical inmate-safety violations at the Jail which put the inmate population at serious risk, but he made the conscious decision not to address those violations.

326.    Brett died as a direct and proximate result of Defendant Wright's acts and omissions, and Plaintiffs were thereby damaged in the form described above and in an amount as yet to be determined.

327.    Punitive damages are available against Defendant Wright and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

328.    Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT TWO

### CIVIL RIGHTS VIOLATIONS – SUPERVISORY LIABILITY
### *Plaintiffs v. Jail Administrator Scott Wright in his individual capacity*

329.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

330.    Obvious symptomatic manifestation of major depression with psychotic features, including suicidal ideation and action, are serious medical needs.

36

331.    Defendant Jail Administrator Scott Wright had a duty to provide for the safety and general well-being of Brett, including protecting him from himself, as an inmate at Todd County Jail.

332.    Defendant Wright, as the supervisor of Todd County Jail personnel, with callous or reckless indifference to the rights of inmates, failed to properly supervise, instruct, and train correctional staff in the recognition of inmates with serious mental-health needs, inmates who are suicidal, the monitoring of inmates with mental-health issues, and in the prevention of suicide in correctional facilities.

333.    Defendant Wright, as the supervisor of Todd County Jail personnel, with callous or reckless indifference to the rights of inmates, failed to ensure that Jail correctional staff properly conducted well-being checks, failed to ensure that correctional officers logged only checks that had actually taken place, and failed to ensure the cameras covering Ad Seg were appropriately monitored.

334.    Defendant Wright, under the color of state law, acted with deliberate indifference to Brett's life-threatening medical needs and serious risk of suicide during his confinement at the Todd County Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

335.    Defendant Wright subjected Brett to these deprivations of his rights either maliciously or by acting with reckless disregard for whether Brett's rights would be violated by his actions.

37

336.     Brett died as a direct and proximate result of Defendant Wright's acts and omissions, and Plaintiffs were thereby damaged in the form described above and in an amount as yet to be determined.

337.     Punitive damages are available against Defendant Wright and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

338.     Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT THREE

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiffs v. Cristina Ann Marie Sobiech*

339.     Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

340.     Obvious symptomatic manifestation of major depression with psychotic features, including suicidal ideation and action, are serious medical needs.

341.     Defendant Sobiech had a duty to provide for the safety and general well-being of Brett, including protecting him from himself, as an inmate at the Todd County Jail.

342.     Defendant Sobiech, under the color of state law, acted with deliberate indifference to Brett's life-threatening medical needs and his serious risk of suicide during his confinement at the Todd County Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

38

343.    Defendant Sobiech, under the color of state law, knew of and disregarded an obvious and serious risk to Brett's health and safety and acted with deliberate indifference, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

344.    Defendant Sobiech subjected Brett to these deprivations of his rights either maliciously or by acting with reckless disregard for whether Brett's rights would be violated by Defendant Sobiech's actions.

345.    Brett died as a direct and proximate result of Defendant Sobiech's acts and omissions, and Plaintiffs were thereby damaged in the form described above and in an amount as yet to be determined.

346.    Punitive damages are available against Defendant Sobiech and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

347.    Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT FOUR

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiffs v. James Olson*

348.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

349.    Obvious symptomatic manifestation of major depression with psychotic features, including suicidal ideation and action, are serious medical needs.

39

350.    Defendant James Olson had a duty to provide for the safety and general well-being of Brett, including protecting him from himself, as an inmate at the Todd County Jail.

351.    Defendant Olson, under the color of state law, acted with deliberate indifference to Brett's life-threatening medical needs and his serious risk of suicide during his confinement at the Todd County Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

352.    Defendant Olson, under the color of state law, knew of and disregarded an obvious and serious risk to Brett's health and safety and acted with deliberate indifference, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

353.    Defendant Olson subjected Brett to these deprivations of his rights either maliciously or by acting with reckless disregard for whether Brett's rights would be violated by Defendant Olson's actions.

354.    Brett died as a direct and proximate result of Defendant Olson's acts and omissions, and Plaintiffs were thereby damaged in the form described above and in an amount as yet to be determined.

355.    Punitive damages are available against Defendant Olson and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

356.    Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT FIVE

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiffs v. John Does 1 and 2*

357.    Plaintiffs reallege and incorporate by reference herein each and every

allegation contained in each paragraph above as if fully set forth herein.

358.    Obvious symptomatic manifestation of major depression with psychotic

features, including suicidal ideation and action, are serious medical needs.

359.    Defendants John Does 1 and 2 had a duty to provide for the safety and

general well-being of Brett, including protecting him from himself, as an inmate at the Todd

County Jail.

360.    Defendant John Doe 1 failed to complete well-being checks in accordance

with Chapter 2911 rules and the policies and procedures of Todd County.

361.    Defendant John Doe 1 falsely logged a well-being check on Brett had

occurred at 1:31 pm on June 9, 2017, when no such check had taken place.

362.    Defendant John Doe 2 either observed and ignored Brett's behavior on the

video feed from the Ad Seg cameras in the Todd County Jail, which obviously indicated not

only a serious and obvious risk of suicide but also a clear breach of correctional security and

protocol, or else consciously chose not to monitor the video feed despite Brett's serious risk

of self-harm.

363.    Defendants John Does 1 and 2, under the color of state law, acted with

deliberate indifference to Brett's life-threatening medical needs and his serious risk of suicide

41

during his confinement at the Todd County Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

364.    Defendants John Does 1 and 2, under the color of state law, knew of and disregarded an obvious and serious risk to Brett's health and safety and acted with deliberate indifference, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

365.    Defendants John Does 1 and 2 subjected Brett to these deprivations of his rights either maliciously or by acting with reckless disregard for whether Brett's rights would be violated by Defendants John Does 1 and 2's actions.

366.    Brett died as a direct and proximate result of Defendants John Does 1 and 2's acts and omissions, and Plaintiffs were thereby damaged in the form described above and in an amount as yet to be determined.

367.    Punitive damages are available against Defendants John Does 1 and 2 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

368.    Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT SIX

### CIVIL RIGHTS VIOLATIONS
### MONELL V. DEP'T OF SOCIAL SERVICES
*Plaintiffs v. Todd County and Jail Administrator Scott Wright in his official capacity*

369.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

370.    Before June 9, 2017, Todd County and Defendant Jail Administrator Scott Wright, with deliberate indifference to the rights of inmates at the Todd County Jail, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern, and practice on the part of Jail correctional officers, including the individual Defendants, of failing to provide for the safety and general well-being of inmates and failing to protect inmates from themselves and/or risks of suicide.

371.    Brett's death and the violation of his civil rights was directly and proximately caused by the aforementioned acts and omissions and by Todd County's customs, patterns, and/or practices, and Todd County is thereby liable in an amount as yet to be determined.

372.    Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### COUNT SEVEN

### FAILURE TO TRAIN
### CITY OF CANTON V. HARRIS
*Plaintiffs v. Todd County and Jail Administrator Scott Wright in his official capacity*

373.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

43

374.    Todd County and Defendant Jail Administrator Scott Wright, with deliberate indifference to inmates at the Todd County Jail, failed to properly train correctional staff and failed to adopt, implement or require adherence to appropriate policies to provide timely and appropriate care for inmates with serious mental illness.

375.    Todd County and Jail Administrator Wright, by such conduct, demonstrated deliberate indifference and a protracted failure to care for the safety of Brett, who had an obvious and serious medical need in the form of a severe mental health crisis.

376.    Brett's death and the violation of his civil rights was directly and proximately caused by the aforementioned acts and omissions and by Todd County's customs, patterns, and/or practices, and Todd County is thereby liable in an amount as yet to be determined.

377.    Plaintiffs are entitled to recovery of their costs, including reasonable attorney fees, under 42 U.S.C. § 1988.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Brett W. Huber, Sr. and Renae Berkland Huber, as co-trustees for the next-of-kin of Brett Warner Huber, Jr., pray for judgment against Defendants as follows:

1.    That this Court find that Defendants committed acts and omissions constituting violations of the Eighth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.    As to Count I, a money judgment against Defendant Jail Administrator Scott Wright for compensatory damages in excess of $3,000,000 and punitive damages in excess of

$3,000,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against Defendant Jail Administrator Scott Wright for compensatory damages in excess of $3,000,000 and punitive damages in excess of $3,000,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Defendant Cristina Ann Marie Sobiech for compensatory damages in excess of $3,000,000 and punitive damages in excess of $3,000,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendant James Olson for compensatory damages in excess of $3,000,000 and punitive damages in excess of $3,000,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

6.      As to Count V, a money judgment against Defendant John Doe 1 for compensatory damages in excess of $3,000,000 and punitive damages in excess of $3,000,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

7.      As to Count V, a money judgment against Defendant John Doe 2 for compensatory damages in excess of $3,000,000 and punitive damages in excess of $3,000,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

45

8.     As to Count VI, a money judgment against Todd County for compensatory damages in excess of $3,000,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

9.     As to Count VII, a money judgment against Todd County for compensatory damages in excess of $3,000,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

10.    For an order mandating changes in the policies and procedures of the Todd County Jail requiring, among other things, policy/training measures in the recognition of serious mental illness and suicidal ideation in correctional facilities and in the prevention of suicide among inmates in correctional facilities; and

11.    For such other and further relief as this Court may deem just and equitable.

GASKINS BENNETT & BIRRELL, LLP

Date: 8-8-18

Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #392087
Marc E. Betinsky, #0388414
333 South Seventh Street, #3000
Minneapolis, MN 55402
Telephone: 612-333-9500
rbennett@gaskinsbennett.com
anoel@gaskinsbennett.com
kbennett@gaskinsbennett.com
mbetinsky@gaskinsbennett.com